### E. A. CASEY, Respondent, v. JOSEPH T. DONOVAN, Appellant.

#### St. Louis Court of Appeals, May 24, 1898.

1. **Bailment**: SUFFICIENCY OF PETITION FOR BREACH OF CONTRACT OF BAILMENT: NEGLIGENCE. Where a petition states in effect that a horse was delivered to the defendant by plaintiff to keep and train; that the defendant agreed to take care of the horse and return it to plaintiff on demand, and that the defendant failed to do so, it states facts sufficient to constitute a cause of action, as proof of these averments would make a *prima facie* case for plaintiff. These allegations are somewhat fuller than necessary, but not to such an extent as to impose on plaintiff the obligation of affirmatively proving in chief that the failure to return the animal was the result of negligence on the part of defendant or his servants.

2. ———: ———: ———: INSTRUCTIONS. Whether the death of the horse in the case at bar, was or was not the natural or proximate consequence of the alleged failure of the defendant to keep him on the farm, presents an immaterial inquiry, since the plaintiff's instructions predicate his right to recover on the sole ground that the animal was killed through the negligence of the agent of defendant.

*Appeal from the Pike Circuit Court.*—HON. REUBEN F. ROY, Judge.

AFFIRMED.

J. D. JOHNSON for appellant.

The petition does not state facts sufficient to constitute a cause of action against the defendant. Cummings v. Maston, 43 Mo. App. 558; Arnot v. Branconier, 14 Mo. App. 431; Milling Co. v. Transit Co., 122 Mo. 258; Goodfellow's Ex'rs v. Meegan, 32 Mo. 280; Wiser v. Chesley, 53 Mo. 547; McCarty v. Wolfe, 40 Mo. 520. Plaintiff can only recover on the ground of defendant's negligence, while the evidence fails to establish any such negligence upon the part of defendant. Milling Co. v. Transit Co., 122 Mo. 258; Wiser v. Chesley, 53 Mo. 547; McCarty v. Wolfe, 40 Mo. 520; Cummings v. Maston, 43 Mo. App. 558; Arnot v. Branconier, 14 Mo. App. 431. The contract of bailment in suit merely provided that defendant should keep, feed and have plaintiff's horse trained, and there was no proof of a breach of this contract by defendant. The man Mills was plaintiff's agent or representative for driving the horse in a race at the time he was killed, and not the agent or representative of the defendant. Kimball v. Armstrong, 103 Mass. 194; Fitzsimmons v. Sothern, 40 Ga. 330; Nolte v. Hulbert, 37 Ohio App. 445; 39 Cent. L. J. 341, and cases cited; Story on Agency, par. 3; Mechem on Agency, pars. 1 and 6; Wharton on Agency, par. 1; Bishop on Cont., p. 1027; 2 Kent's Com., p. 834. If defendant's promise alleged by plaintiff to have been made on April 5, 1891, to send Farnan or some equally trustworthy person along with Mills, when he took plaintiff's horse from defendant's farm, was a part of the contract

of bailment in suit; then defendant's failure to keep the promise did not render defendant liable for the death of the horse, because that occurrence resulted from Mills becoming intoxicated, and was not the natural or proximate consequence of defendant's failure to keep the said promise. State v. Ward, 9 Heisk. (Tenn.) 100; 1 Sedg. on Dam. [8 Ed.], pars. 126–142; Sherman & Red. on Neg., par. 20.

T. J. ROWE and HIRAM N. MOORE for respondent.

The petition states all facts necessary to constitute a cause of action against the defendant. The petition charges that the horse was intrusted to the defendant to be trained and driven, and that the loss was due to the facts that it was so driven by defendant's servant as to be killed, and the evidence supports both these averments. There being evidence tending to show that the horse was delivered to the defendant in good condition, and a failure on his part to return it on demand, the plaintiff's evidence was sufficient to show a right of recovery. Casey v. Donovan, 65 Mo. App. 525, 526. A case tried in substantial conformity to a former decision in the same case on appeal will be affirmed. 35 Mo. App. 472. Especially where there have been two verdicts for the same party. Costigan v. Trans. Co., 38 Mo. App. 219. When a cause is appealed for the second time, the questions of law decided on the first appeal are not open for discussion on the second. Hance v. R. R., 62 Mo. App. 60; Gordon v. Eans, 97 Mo. 594; Hombs v. Corbin, 34 Mo. App. 393. Mills' agency was an issue submitted to the jury. The finding of the jury that Mills was the agent of the defendant can not be disturbed. Donovan v. Ryan, 35 Mo. App. 160. Defendant's refused instructions are in the main erroneous. Where correct

in principle, are substantially embodied in the other instructions given. The instructions given submit to the jury all the proper elements in the case, pro and con. Additional instructions, even if correct in form, were unnecessary, and a refusal to give an instruction upon a branch of the case already covered by instructions is not prejudicial error. McClure v. Ritchey, 30 Mo. App. 445. Appellant does not attempt to point out the value of the testimony, or indicate any real injury resulting to him from the ruling of the court. Gordon v. Eans, 97 Mo. 603. Besides the petition was only excluded in part. An examination of the record will show that the facts averred in the excluded part were substantially set out in part admitted. The result could have been no different, had all of the petition been admitted.

BIGGS, J.—This is the second appeal in this case. On the first appeal the judgment, which was in favor of the plaintiff, was reversed for errors in the instructions. (65 Mo. App. 521.) The action is to recover damages for the violation of a contract of bailment. The facts about which there is no dispute are these: In 1890 the plaintiff was the owner of a trotting stallion called "Mark Twain." At that time the defendant was the owner of a stock farm near Montgomery City, Missouri. The plaintiff lived in Montgomery City and the defendant lived in the city of St. Louis. The farm was under the control and management of one William Farnan, a servant of the defendant. The defendant was engaged in breeding and training trotting horses. He had prepared a race track on his farm, and he employed one C. H. Mills to break and train his horses. In the fall of 1890 the plaintiff with the consent of Farnan, but without the knowledge of defendant, sent Mark Twain

STATEMENT.

to the farm to be kept and driven by Mills. Subsequently the defendant was advised of the arrangement and consented to it, and the plaintiff agreed that he would compensate the defendant for the keep and training of the horse. In April, 1891, the plaintiff went to Europe. Before starting on his journey he had a talk with the defendant concerning the care of the horse during his absence. As to what was then said and agreed to the parties differ. Their respective versions will be stated further on in this opinion. The horse remained on the farm until the latter part of June, when he was taken by Mills to Alton, Illinois. With the knowledge and consent of the defendant Mills entered the horse in a trotting race at Alton, in which he won the purse. At that time there was what was called "the trotting circuit" in North Missouri, consisting of trotting races at Hannibal, Louisiana, Mexico, Moberly, and, perhaps, other places. The races began in Hannibal the latter part of July and were held at other places during the months of August and September. The races at Louisiana followed those at Hannibal, and the next of the series took place in Mexico. With the consent of the defendant, Mills entered the horse in races at Hannibal and Louisiana. Preparatory to starting in the races at Louisiana Mills drove the horse onto the track for the purpose of "warming him up," and while so doing there was a collision with another horse which resulted in the death of plaintiff's horse. As to the terms of the bailment and the conditions under which the horse was taken from the farm and entered in the races, there is a decided conflict in the evidence. The contention of the plaintiff is that the contract of bailment was violated in that the defendant wrongfully permitted the horse to be taken from the farm and entered in races, and that the death of the horse was caused by

the negligence of Mills, who had charge of him as the servant of the defendant. On the other hand the defendant urges that he was not responsible for the removal of the horse from the farm, nor for the action of Mills in entering him in the races; that the horse was taken from the farm under the direct orders of plaintiff to defendant, and that he was entered in the races by Mills under instructions contained in a letter from plaintiff to Farnan, and that the defendant consented or acquiesced in the action of Mills in racing the horse after he had read the plaintiff's letter to Farnan. The trial resulted in a verdict and judgment for plaintiff for $500. The defendant has appealed and he complains of the action of the circuit court as to the instructions, and as to the admission and exclusion of evidence.

One of the main contentions of defendant's counsel is that the defendant's instruction for nonsuit ought to have been given. While admitting the possession or bailment of the horse by defendant for *training* purposes and as to this service that Mills was the agent of defendant, counsel earnestly contend that as it is undisputed that the horse was killed while being *raced*, the defendant is not liable in the action for the reason that the letter from plaintiff to Farnan, which was written while the plaintiff was in Europe, authorized Farnan to put the horse in Mills' custody for racing purposes; that Farnan did as plaintiff requested, thereby constituting Mills plaintiff's agent for the purpose of racing the horse.

The further contention is made that the plaintiff expressly directed the defendant by cablegram to let Mills take the horse on the circuit. To understand this assignment it is necessary to state the evidence fully. The following extracts from the testimony of

plaintiff show his understanding of the agreement which was entered into just before he left for Europe.

"Q. State, as near as you can, where you were and word for word, what that conversation was with Mr. Donovan at his farm the afternoon of April 5, 1891? A. Well, we were on Mr. Donovan's farm near the colt barn. I asked Mr. Donovan how the horses were getting along; he said he wasn't realizing his anticipations, but his trainer Mills, thought he would increase their speed, and they would do better after while. I asked him what prospect there was for him sending his horses on the circuit. Q. State what you mean by the circuit. A. A combination of different towns that associate and call themselves the circuit. People entering through that circuit have certain privileges that they can not enjoy if they leave that circuit and go to another.

Testimony.

Q. You asked him what prospect there was for sending his horses on the circuit? A. Yes, sir, and he said he didn't know. He didn't know whether he would send them on the circuit or not, they hadn't attained speed enough. He said to me, 'By the way, I hear you are going to the old country. I am sorry you are going; what disposition will I make of Mark in your absence? That was the horse's name.' Q. Mark Twain? A. Yes, sir. I said to him, 'I expect Mark is good for his board,' and he says, 'Yes, and a good deal better.' I says, 'I want Mark trained here on the farm, and his training continued up to the Mexico fair, commencing the first week in August, and I want him entered there in the three minute class to perform for the first time publicly in a race,' and I said still further that if he would send his horses on the circuit to the different fairs and race meetings, that I wouldn't consent to have this horse of mine taken along except he send his manager, Farnan, along to

superintend Mills in his conduct of the horses, or some other man equally trustworthy. He said he didn't know how he could afford to have Farnan go, but he would find another man equally trustworthy and reliable. Well, I told him I didn't want the horse sent on the circuit for racing purposes, I wanted him without any mark or record in Mexico, and I wanted him there to make his first race, in Mexico, to be trotted the first week in August, and I would be back from the old country to witness it. I desired to have him go along on these other circuits to accustom him to company and to have him trained and conditioned, in order that he would be properly disciplined for his first race at Mexico, and I intended to sell him there. Q. You told Mr. Donovan the first place you wanted him entered was the Mexico fair? A. Yes, sir.'' The plaintiff also introduced evidence which tended to show that at the time of the accident Mills was intoxicated and that the collision was due to his negligence.

The following is substantially the testimony of the defendant in reference to the horse. ''Q. Do you remember of having a conversation with Father Casey at the farm during April, or the spring of 1891, in which it was mentioned that Mr. Casey was going to Ireland? A. I remember the April interview, which occurred on the fifth of April, very well. I don't claim, don't think, that I remember all that was said, but I know what I communicated to Father Casey that day; I know where I met him that day; I know I met Father Casey that day at the colt's barn and that we walked together toward the house; there were four or five in company; I don't think I was especially alongside Father Casey, separated from the others. I know I said to Father Casey that I had employed Mr. Mills. Q. That is re-employed him? A. Re-employed him. Mr. Mills'

<span style="float:left">DEFENDANT'S<br>testimony.</span>

time of contract with me for the winter months had expired, and my purpose in going to the farm on that occasion was to adjust matters so as to re-employ him, and it was upon that morning we came to, that he accepted of the terms which I offered him. Q. You reported that to Father Casey? A. I reported that to Father Casey, because I knew from previous conversations with Father Casey that it would gratify him, as it did me at the time. Q. Do you recall what was said upon the point which Father Casey and Mr. Cogley have testified to here? A. No, I don't, I know that at various times Father Casey had spoken to me about sending some man, or sending Farnan along with the horses, if they went out on the circuit. (Objection). Q. Go on. A. I several times told Father Casey that Farnan could not go. The other parts that are injected into that conversation with reference to my sending a responsible man along, I never remembered at all, I never did recall; I don't believe that I ever did promise it. Q. Could you have spared Mr. Farnan? A. I never could have spared Mr. Farnan from the farm, I didn't know who to put in his place if I had sent him. Q. Now when did you determine to send your string of horses away from the farm that summer? A. It was about the thirteenth of June. Q. How many horses did you have under Mills' care? A. We had from three to five; sometimes three; sometimes four; sometimes five. Q. How many did you send away? A. Well, we sent away three, but I was thinking we sent way four. I can only remember three now. Q. You cabled Father Casey did you? A. I cabled Father Casey on the thirteenth of June. Q. How did you come to do it? State all that occurred. (Objection.) A. Mr. Mills called at my house in St. Louis. Q. Mr. Mills? A. Yes, sir;

this man that testified here, and he reported the horses were doing very poorly at the farm, that the track was hard, somewhat wavey, and that they had a good mile track at Alton and he believed if we took them there preparatory to taking them on the circuit they would do better.    I said to Mr. Mills that I didn't think any of the horses were sufficiently trained to go upon the circuit, to justify the outlay.    Q.    Come down to Mark Twain, what you said about Mark Twain?    A.    Then I asked him—I said to him, I finally consented I would send my horses, and I asked him if he had any instructions from Father Casey with reference to Mark Twain. He answered that he had not.    Then I says, you can not take Mark Twain from the farm unless you have direct authority from Father Casey.    Well, he said he would like to take Mark along, he thought it was bad policy to leave him, and I said I would cable Father Casey and ascertain his wishes."    The cablegram and answer is as follows:

"June 15th, 1891.

"*Rev. E. A. Casey.*    "Mills goes on circuit with horses.    Will Mark go or remain?    Answer.

"DONOVAN."

"KILMOLLOCK, June 17, 1891.

"Donovan, 3037 Pine St., St. Louis, Mo.    Send Mark.                           CASEY."

The following letters from plaintiff to Farnan were read in evidence:

"LONDON, May 19th, 1891.
"*Mr. William Farnan:*

"MY DEAR SIR:—I was looking for some word from you about how matters were progressing.    I will be in Kilmollock back in few weeks and will expect to hear from you there, and will tell you when I am

Casey v. Donovan.

returning and what to prepare to do with Master Mark
Twain. All well. Kind regards. Yours truly,

"E. A. CASEY."

"KILMOLLOCK, June 13, 1891.

"MY DEAR WILLIE:—Your first letter to hand.
Am very glad of the news. You will please to enter
"Mark" in the stake race at Mexico, three-minute class,
I think, trotted the 8th of August, or purchase a
nomination, and you will have Mr. Mills to make an
event in the Mexico fair, "Mark's" first performance.

"I will retire from Irish life about the end of July
and will manage to be surely home for Mexico fair.
You may enter him through the circuit throughout,
especially in the stake races and lose no time and find
when you can do so. Of course Mr. Mills will post
you and give best directions and act as you always did
with him in unity, because I believe Mills is a good
clever fellow. Tell Mr. Mills we want the money and
to lose no opportunity of making most of the season
beginning with Mexico.

"Have Willie Murphy instructed to have "Mary
V" bred and stinted to "Richard Sprague" and to
leave the cow in the pasture.

"Well, we enjoy time very pleasantly. Give Mr.
Mills my regards, and with the old love renewed for
your ownself, mother and family, Mr. Donovan and
family, I remain, Your friend sincerely,

"E. A. CASEY."

The defendant then testified that he had nothing
to do with entering the horse in the races; that this
was done by Mills, and that he consented that it should
be done as he construed the letter of plaintiff to Far-
nan as authorizing Mills to race the horse. The argu-
ment of the defendant on this phase of the case rests
solely on the letter of plaintiff to Farnan of date June
13 (*supra*). The difficulty is that the defendant

entirely misconstrues the letter. In it the plaintiff first directs Farnan to enter the horse in the races at Mexico, which he proposed should be "Mark's first performance." He further instructs Farnan to enter the horse in the stake races throughout the circuit *beginning* at Mexico. He seems to have been under the mistake that the races for the season opened at Mexico, for otherwise his direction that the horse be entered in the races throughout the circuit could not possibly have been carried out. This mistake was apparent to persons who were acquainted with the dates of the various races. The prominent and controlling direction in the letter was that the horse should not be trotted until the Mexico fair, at which time the plaintiff expected to be back from Europe and would superintend the racing of the horse himself. This was but a reiteration of plaintiff's purpose emphatically expressed by him before leaving for Europe. For some unexplained reason he appeared to be anxious that the horse should not make a record or mark in a public race until the Mexico fair. This ought not to have escaped the attention of the defendant in reading the letter. It is clear, therefore, that the contention of the defendant, that under the conceded testimony Mills was the agent of the plaintiff in racing the horse, is not well founded in fact. On the contrary the evidence tended to prove that at the time the horse was killed he was by virtue of the original contract of bailment, under the control and management of Mills as the servant of the defendant, and as there was evidence tending to prove that the accident was the result of the negligence of Mills, the instruction of nonsuit was properly refused.

Whether the death of the horse was or was not the natural or proximate consequence of the alleged failure of the defendant to keep him on the farm, presents an immaterial inquiry, since the plaintiff's

instructions predicate his right to recover on the sole ground that the animal was killed through the negligence of Mills, and that Mills had possession of the horse at the time as the agent of the defendant.

Complaint is made that the petition is insufficient in that it fails to aver that the failure to return the horse was by reason of the negligence of defendant. The defendant invokes the rule that a party may by inserting unnecessary allegations in his pleading be compelled to assume a greater burden of proof than the law would otherwise require of him. We do not regard the rule as being applicable in this case. The petition states in effect that the horse was delivered to the defendant to keep and train, that the latter agreed to take care of the horse and return him to plaintiff on demand, and that the defendant failed to do so. The averment of these facts was sufficient, as proof of them would make a *prima facie* case for the plaintiff. The allegations are somewhat fuller than necessary, but not to such an extent as to impose on plaintiff the obligation of affirmatively proving in chief that the failure to return the animal was the result of negligence on the part of defendant or his servants.

PETITION is sufficient.

Complaint is also made of the plaintiff's instructions. They are in accordance with our former opinion. We have examined them and we believe that they fairly present the issues in the case.

After the horse was killed the wife of the defendant sent him word by E. G. Cogley "that he (defendant) should order the horses home at once, before Mills would kill any more of them." The court permitted Cogley to testify to this, which was undoubtedly error. But we do not think that it was prejudicial error. The testimony only indicated the opinion of Mrs. Donovan as to the negligence of Mills in handling

the horse. The evidence was overwhelming that Mills was drunk when the accident occurred, and that the accident was caused solely by his negligence, therefore it is not probable that the evidence complained of had any influence on the jury in arriving at their conclusion on the question of the negligence of Mills.

Other exceptions were saved to the admission of evidence, which we overruled, as either not being well taken, or not of sufficient importance to change the result.

With the concurrence of the other judges, the judgment of the circuit court will be affirmed.